UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHRISTOPHER BROWN,
    *Plaintiff*,

v.

WARDEN FAUCHER *et al.*,
    *Defendants*.

No. 3:19-cv-00690 (JAM)

## INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A

Christopher Brown is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 alleging that defendants improperly placed him in restrictive housing in violation of his constitutional rights. For the reasons stated below, I will dismiss Brown's complaint.

### BACKGROUND

Brown was confined at the Corrigan Correctional Center at the time of the events alleged in the complaint. His complaint names the following defendants: Corrigan Correctional Center Warden Faucher, District Administrator Edward Maldonado, and Lieutenants Cronin and Conjer. Doc. #1 at 2 (¶¶ 1-6).

The following facts are alleged in the complaint and are accepted as true only for purposes of this ruling. The DOC has classified Brown as a seriously mentally ill inmate. *Ibid.* (¶ 7). He has been diagnosed with post-traumatic stress disorder, borderline personality disorder, and anti-social personality disorder. *Ibid.* (¶ 8). He also suffers from suicidal ideations. *Ibid.* (¶ 9).

On August 17, 2017, at approximately 8:15 a.m., Counselor Crane, the grievance coordinator, entered Brown's housing unit to collect the grievances from the designated boxes.

*Ibid.* (¶ 11). Crane found an anonymous inmate request form with the following written message: "I should just knock you out you dumb white hoe." *Id.* at 4 (¶ 11), 17. Crane interpreted the message as threatening in nature and reported it to the unit manager, Lieutenant Cronin. *Id* at 4 (¶¶ 11-12), 17-18.

Upon receiving the inmate request form, Cronin launched an investigation to determine who wrote the message and placed the form in the grievance box. Doc. #1 at 4 (¶ 12). After reviewing the video surveillance system, Cronin determined that Brown's cellmate, Armand Beiaj, had gone to their cell, at which point Brown had passed him the form through the door crack. *Id.* at 4 (¶¶ 13-14), 18. Afterward, Beiaj walked directly to the grievance box and dropped the form inside. *Id.* at 18. The original inmate request and DVD with the surveillance footage were both stored as evidence in a facility safe. *Id.* at 4 (¶ 14), 18.

As a result of the investigation, Beiaj was issued a Class A disciplinary report for accessory to commit assault on a DOC employee and placed in a restrictive housing unit ("RHU") on administrative detention status. Doc. #1 at 5 (¶ 15), 18. Although he was not issued a disciplinary report for the threatening message, Brown was also placed in segregation on administrative detention status pending the outcome of the investigation. *Id.* at 5 (¶¶ 15-18). Brown contends that the video surveillance footage does not show him passing anything to Beiaj—and that if it had, he would have also received a disciplinary ticket for acting as an accessory alongside Beiaj. *Id.* (¶ 19). Thus, he claims that his placement in segregation was done in retaliation for his numerous lawsuits filed against Corrigan personnel. *Id.* at 6 (¶ 21).

Brown was placed in a solitary confinement unit with no windows or clocks. *Ibid.* (¶ 22). He was forced to eat all his meals in his cell and was deprived of personal property, phone calls, and contact visits. *Ibid.* The conditions exacerbated his pre-existing mental health problems. *Ibid.*

(¶ 23). Brown remained in the RHU for more than one month. *Ibid.* (¶ 22). While confined there, Brown sought to preserve the camera footage and other evidence from the August 17 incident via inmate request form. *Id.* at 7 (¶ 24), 23.

Brown later learned that Cronin did not have the authority to place him in segregation because, pursuant to DOC regulations, such a decision may only come from a shift commander, the warden, the deputy warden, or the director of offender classification. *Id.* at 7 (¶ 27), 25. Brown filed a request on August 31, 2017, challenging Cronin's decision to place him in segregation. *Id.* at 8 (¶ 28), 26. After confirming that it was Cronin who ordered the placement, Brown filed a grievance against him for placing him in segregation without a hearing or an explanation of the reasons for his placement. *Id.* at 8 (¶ 29), 27. Brown also contended that Cronin did not have the authority to order his placement in segregation. *Id.* at 27. The grievance was denied on September 27 on the ground that Brown's placement in segregation on administrative detention status was authorized under DOC Administrative Directive 9.4 § 3(B). *Ibid.* That provision defines "Administrative Detention" as "[p]lacement of an inmate in a [RHU] that results in segregation of the inmate . . . [f]or investigation of an allegation or information involving the inmate in the commission of a crime, or of activities jeopardizing the security of the facility or the safety of staff or inmates that could result in placement on punitive or administrative segregation or transfer to high security." *Id.* at 30. Brown appealed the denial of the grievance to District Administrator Maldonado. *Id.* at 8 (¶ 30), 28. Maldonado denied the appeal, reasoning that Brown's administrative detention status was authorized pursuant to Administrative Directive 9.4, § 3(B). *Id.* at 28.

On August 30, 2017, Lieutenant Conjer placed Brown on consecutive administrative detention status "pending a custody review for a staff profile." Doc. #1 at 10 (¶¶ 39-40), 31. Like

3

Cronin, Conjer does not have the authority to order administrative detention. *Id.* at 10 (¶ 40). Once again, Brown filed an inmate request challenging Conjer's decision. *Id.* at 11 (¶¶ 42-43), 32. Conjer responded that the order was authorized under Administrative Directive 9.4 § 9(A). *Id.* at 32. That provision provides:

> In order to protect the inmate or others, the Unit Administrator or designee may order an inmate's placement on restrictive housing status, Administrative Detention or Transfer Detention by completing CN 9401, [RHU] Status Order, stating the specific reasons for placement. Copies shall be distributed as designated on CN 9401, [RHU] Status Order. The Unit Administrator shall receive the original copy of the order within 24 hours or the following business day after placement. The Unit Administrator shall see that the required reviews are performed and documented on CN 9401, [RHU] Status Order.

*Id.* at 47. Brown then filed grievances challenging the second administrative detention order, which Warden Faucher denied. *Id.* at 11 (¶ 44), 36. Faucher stated that one of the grievances was duplicative of the first grievance and that custody review was an investigation which authorized administrative detention. *Id.* at 11 (¶ 44), 36, 46.

Brown appealed Faucher's decision to District Administrator Maldonado. Doc. #1 at 11 (¶ 46), 33, 37, 42. Among the arguments he raised on appeal, Brown contended that he was unlawfully kept in the RHU for 29 days when Administrative Directive 9.4 (Attachment B) authorizes administrative detention for only 14 days. *Id.* at 11 (¶ 45), 34, 45. Maldonado denied the appeal on the ground that Brown's administrative detention was authorized under Administrative Directive 9.4. *Id.* at 11 (¶ 46), 33, 37, 42.

On September 12, 2017, Conjer placed Brown on administrative detention status for a third time "pending staff profile." Doc. #1 at 13 (¶ 54), 35. Brown challenged the decision through the administrative remedy procedure, but officials upheld Conjer's decision. *Id.* at 13 (¶ 55). Officials at Corrigan performed periodic reviews of Brown's administrative detention status in accordance with DOC policy. *Id.* at 14 (¶ 62), 39. Brown's status was continued repeatedly

4

from August 20, 2017 to September 5, 2017, *id.* at 39, 40, and Brown appears to have left restrictive housing on September 13, 2017, when he was transferred from Corrigan, *see id.* at 40-41.

**DISCUSSION**

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Brown claims that his placement in segregation on administrative detention status in late 2017 violated his Eighth Amendment protection against cruel and unusual punishment and his Fourteenth Amendment right to procedural due process. He may also be attempting to state a

claim for First Amendment retaliation. His factual allegations, however, fail to state a plausible claim for relief under any of these constitutional provisions.

### *Eighth Amendment conditions of confinement*

The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. "Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." *Hutto v. Finney*, 437 U.S. 678, 685 (1978). But not all imprisonment is cruel and unusual. In order to establish an Eighth Amendment violation, an inmate must show (1) a deprivation that is, objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities; and (2) a sufficiently culpable state of mind on the part of the defendant official. *See, e.g.*, *Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015).

Brown claims that his confinement in segregation violated his right against cruel and unusual punishment. The mere fact of solitary confinement does not, in and of itself, violate the Eighth Amendment. *See Hutto*, 437 U.S. at 686. Nor do the deprivation of contact visits or personal property. *See Green v. Santiago*, 2017 WL 2312355, at *5 (D. Conn. 2017); *Smith v. Burge*, 2006 WL 2805242, at *7-*8 (N.D.N.Y. 2006).

Brown does allege, however, that he is severely mentally ill and that his confinement in segregation exacerbated his mental illness. There is substantial authority to suggest that "the use of solitary confinement may cause grave harm, especially to inmates to have mental illness." *Tuttle v. Semple*, 2018 WL 2088010, at *6 (D. Conn. 2018). In *Tuttle*, for example, I allowed a prisoner's Eighth Amendment claim arising from a combination of solitary confinement and mental illness to proceed despite the likely applicability of qualified immunity in light of the plaintiff's *pro se* status and the fact he had spent about a year in solitary confinement. *See ibid.*;

6

*see also Lexis v. Bellemare*, 2019 WL 1596571, at *6-*7 (D. Conn. 2019) (allowing Eighth Amendment mental health and solitary confinement claim to proceed from 108 days of solitary confinement).

Brown's claim is different. He alleges that he spent approximately one month in segregation—from mid-August to mid-September of 2017. *See* Doc. #1 at 4-6 (¶¶ 11, 15, 22), 14 (¶ 63), 39-42. *Compare id.* at 27 (grievance filed from restrictive housing on September 1, 2017), with *id.* at 28 (grievance filed from Corrigan N-Block housing on September 28, 2017). This time period is significantly shorter than the alleged periods of solitary confinement in *Tuttle* and *Lexis*. Moreover, unlike the periods of confinement at issue in *Tuttle* and *Lexis*, Brown's time in segregation took place entirely prior to the Second Circuit's opinion in *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48 (2d Cir. 2017). There, the court of appeals held that prior to its opinion, there was not clearly established law as to "what restrictions could legitimately be placed on a *particular* detainee" where, as here, prison officials find administrative detention necessary because of an inmate's particular risks to prison security, *id.* at 59 n.7. Because the doctrine of qualified immunity allows government officers to only be sued for damages under § 1983 for conduct that is "clearly established" as unlawful at the time it is challenged, *see Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019), I conclude that qualified immunity squarely bars Brown's Eighth Amendment claim as to his confinement in segregation. Accordingly, Brown's Eighth Amendment claim is dismissed.

### *Fourteenth Amendment due process*

The Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The "standard analysis" for a claim of a violation of procedural due process "proceeds in two steps: We first

ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

In the prison context—involving prisoners whose liberty interests have already been severely restricted because of their confinement—a prisoner plaintiff who complains of adverse action without due process must show that the adverse action amounted to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Thus, in *Sandin*, the Supreme Court concluded that a prisoner who was subject to a disciplinary term of 30 days confinement in restrictive housing did not sustain an atypical and significant hardship to constitute a deprivation of a liberty interest that would be subject to protection under the Due Process Clause. *Id.* at 486. The Supreme Court noted as well that disciplinary custody was not atypical because "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Ibid.*

Following *Sandin*, the Second Circuit has explained that the "factors relevant to determining whether the plaintiff endured an atypical and significant hardship include the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (internal citations and quotations omitted). The Second Circuit has further observed that "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (*per curiam*). The *Davis* court went on to note that "SHU [special housing unit]

8

confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Ibid.* (internal quotations omitted).

Brown's roughly monthlong restrictive confinement falls well below the length of time that ordinarily gives rise to a liberty interest for purposes of a due process claim. *See Galarza v. Erfe*, 2019 WL 121784, at *5 (D. Conn. 2019) (48-day confinement too short to give rise to liberty interest). And while Brown alleges that he did not have access to a clock or to phone calls, and that he had to eat meals in his cell, he does not allege that any of the conditions of his confinement were substantially atypical so as to give rise to a liberty interest. *See ibid.* (collecting cases). Accordingly, I conclude that Brown has failed to state a plausible claim that he was deprived of a liberty interest, and so will dismiss his due process claim.

### *First Amendment retaliation*

Although he does not explicitly state that he is pursuing a claim for First Amendment retaliation, Brown's complaint may be read as attempting to state such a claim. *See* Doc. #1 at 6 (¶ 21) ("All that was done to the plaintiff here in this matter was a retaliatory act because of the plaintiff's numerous lawsuits against personel[l] at Corrigan C.C. for violating the plaintiff's constitutional rights."). The basic requirements for a constitutional retaliation claim are that a plaintiff engaged in speech or some other conduct protected under the Constitution and that the defendant in turn took adverse action against the plaintiff because of the constitutionally protected speech or activity. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). But courts treat prisoner retaliation claims "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to

the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (citation omitted). Consequently, the Second Circuit has required that prisoner retaliation claims "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Dolan*, 794 F.3d at 295 (internal quotations and citation omitted).

Brown's claim of retaliation is limited to the bare conclusory allegation of retaliation in a single paragraph of his complaint. Unlike his remaining allegations that specifically address which defendants undertook which actions, Brown's allegation of retaliation does not specify what other litigation Brown has pending, nor whether any defendants were aware of that litigation. Because Brown's allegations are "mere conclusory statements" that are simply "consistent with" defendants' liability, *see Iqbal*, 556 U.S. at 678, he does not state a plausible First Amendment retaliation claim, and any such claim is therefore dismissed.

## CONCLUSION

For the foregoing reasons, Brown's complaint is DISMISSED without prejudice because Brown has not alleged facts to plausibly show a violation of his constitutional rights. To the extent that Brown complains of any violation of prison regulations and grievances, such violations of internal prison policies does not mean that there has been a violation of the Constitution. Brown may file a motion to reopen along with an amended complaint within 30 days by **August 18, 2019** that cures the factual deficiencies identified in this ruling and alleges facts sufficient to show that each defendant violated his constitutional rights. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 18th day of July 2019.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge